UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DISABILITY LAW CENTER, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| KENNEDY-DONOVAN CENTER, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

### I. PRELIMINARY STATEMENT

Plaintiff Disability Law Center, Inc. ("DLC"), brings this action for a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) as a result of the Defendant, Kennedy-Donovan Center Inc.'s ("KDC"), unlawful refusal to grant DLC access to certain records, as well as a list of guardians and their contact information for all children and adolescents who have attended the Kennedy-Donovan Center School ("KDCS"), an approved private special education day school, located in New Bedford, Massachusetts, for any period of time from January 2001 to the present. DLC is also requesting any and all records, reports, or forms produced relating to an internal review conducted by KDCS concerning serious allegations of abuse and neglect by staff against students. Finally, DLC requests that this Court enjoin KDC from interfering, in any way, with DLC's investigation of KDC.

1

DLC is likely to succeed on the merits of its claim that KDC's actions were in clear contravention of statutory and case law. Congress drafted the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. §15001, *et. seq.*, because of the concern it had over instances of abuse of developmentally disabled persons such as those contained in the allegations in the instant matter. The DD Act established the Protection and Advocacy System ("P&A"), a nationwide network of disability rights agencies, which are mandated and designated for every state and territory of the United States of America, to investigate and remedy abuse and neglect of persons with developmental disabilities, and provide them with legal representation and advocacy services. *See e.g.*, 42 U.S.C. § 15043 (a)(2)(A)(i). To accomplish this goal, Congress granted broad investigative access rights to the P&As. DLC, as the P&A for the Commonwealth of Massachusetts, has a right to the records that are being requested. 42 U.S.C. § 15043 (a)(2)(I)(i)-(iii). If KDC does not release the records to DLC, DLC will suffer irreparable harm because DLC will not be able to fulfill its statutory obligation to investigate abuse and neglect, as well as to provide protection and advocacy services to students who have been, and may still be, at risk of abuse. There will be no harm to KDC because the release of records to a P&A does not violate the confidentiality provisions of the Family Educational and Privacy Rights Act ("FERPA"), 20 U.S.C. §1232g, or the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400 *et. seq.* Lastly, the public interest will not be harmed, but rather furthered by DLC having access to the records and in preventing harm to students at KDCS.

## II. STATEMENT OF THE FACTS

In November 2002, Venilde Cabral, mother of Kristen Cabral, a former KDC School student, contacted DLC concerning her daughter's special education needs. *Cabral Affidavit* ¶ *18*. During the course of DLC's investigation of the special education matter, Mrs. Cabral informed the Disability Law Center about incidents of alleged abuse and neglect against her daughter that occurred while her daughter was attending the Kennedy-Donovan Center School from approximately February 26, 2001 to August 1, 2002. *Id; Campbell Affidavit* ¶ *12*. Her concerns included instances of inappropriate restraint of her daughter in direct contravention of her behavioral plan, as well as times in which her daughter was denied food and beverage as a form of punishment. *Cabral Affidavit at* ¶¶ *12, 16; Campbell Affidavit at* ¶¶ *9, 14, 16*.

During the investigation of Kristen Cabral's special education matter, Mrs. Cabral provided DLC with the names of five former KDC School employees who resigned from the Kennedy-Donovan Center School beginning on July 30, 2002 and subsequently thereafter through the end of August, 2002. *Cabral Affidavit* ¶ *18*. Specifically, Mrs. Cabral gave DLC a resignation letter dated July 30, 2002, from former KDC School teacher, Patricia Campbell. *Campbell Affidavit, Attachment No. 1*. According to her letter, Ms. Campbell left the Kennedy-Donovan Center School due to "staff violating the human rights of [her] students." *Id.* Ms. Campbell also stated in her resignation letter that she and "other staff members in the building [had] reported instances of students being restrained improperly, changed in public, denied food and beverage at unscheduled snack times and threatened to deny children food and beverage." *Id.*

In response to Ms. Campbell's resignation letter, a team from KDC headquarters in Foxboro, Massachusetts, conducted an internal review concerning the allegations of abuse and neglect outlined in Ms. Campbell's letter. *Forcier Affidavit ¶ 8.* To date, DLC has been unable to obtain a copy of the KDC internal review or any Corrective Action Plan which may have followed such a review. DLC, therefore, is unable to determine whether or not the review was adequately conducted, whether students are still at risk, and whether there are appropriate procedures in place to prevent incidents of abuse and neglect. *Griffin Affidavit ¶ 12.*

Based on the initial complaint and DLC's review of Ms. Campbell's resignation letter, DLC initiated an investigation of the allegations of abuse and illegal restraint by interviewing Ms. Campbell and the four other former employees. *Griffin Affidavit ¶ 4.* DLC staff interviewed, in-person, each former employee, for approximately twelve total hours, between the periods of October 10, 2003 to November 21, 2003. *Id.* All of the former KDC employees that were interviewed, substantiated the allegations. *Id.* The interviews were tape recorded, with permission, and transcribed. *Id.* During the interviews, each of the witnesses provided documentation relevant to the investigation.

After reviewing the documents provided by the witnesses and transcripts of the interviews, DLC determined that probable cause existed to believe that students at the KDC School have been, and may still continue to be, victims of abuse and illegal restraint, as that term is set forth in the DD Act. 42 U.S.C. §15043(a)(2)(B); *Griffin Affidavit ¶ 11.*

DLC informed KDC of its findings of probable cause and subsequently requested through a series of correspondence between the dates of December 17, 2003 and February

25, 2004, that KDC provide DLC certain documents and information in order for DLC to continue and complete its own investigation, including an evaluation of KDC's internal review, and any remedial plan developed by KDC concerning the allegations of abuse and neglect. *Griffin Affidavit ¶ 5, Attachments 1, 3, 5, 7*. DLC identified its legal authority to receive and review the requested documents and information pursuant to 42 U.S.C. §15043 and 45 C.F.R. §1386.22, as well as supporting case law. *Griffin Affidavit ¶ 5, Attachment No. 1*.

KDC declined to provide DLC access to the records requested as well as the names of guardians, and the contact information for all students attending KDC's private day school, stating that such release of records would violate both state and federal statutes and regulations dealing with disclosure of student information. *Griffin Affidavit ¶ 5, Attachments 2, 4, 6*.

DLC's efforts to obtain the information and records through direct negotiation with KDC were ultimately unsuccessful. *Griffin Affidavit ¶ 5*. DLC concluded that without a list of guardians and their contact information as well as other records, we could not proceed with an adequate investigation and could not meet our statutory obligation to provide Protection and Advocacy services. *Griffin Affidavit ¶ 12*.

### III. ARGUMENT

A. The Plaintiff Meets the Requirements For a Preliminary Injunction

In order for a preliminary injunction to issue, the Court must determine that (1) plaintiff has exhibited a likelihood of success on the merits; (2) plaintiff will suffer irreparable injury if the injunction is not granted; (3) such injury outweighs any harm which granting injunctive relief

would inflict on the defendant; and (4) the public will not be adversely affected by the granting of the injunction. Coastal Fuels of Puerto Rico Inc. v. Caribbean Petroleum Corp., 990 F. 2d. 25, 26 (1st Cir. 1993). Plaintiff meets these requirements for a preliminary injunction.

### 1. DLC is Likely to Succeed On the Merits of Its Claim That KDC's Actions Were Unlawful.

#### a. DLC as a P&A has a right to the internal review records it requested and needs the records to conduct an investigation.

When Congress enacted the DD Act, 42 U.S.C. §15001 *et seq.*, it found that individuals with developmental disabilities in facilities such as the Kennedy-Donovan Center School are vulnerable to abuse and neglect. 2000, Pub. L. 106-402. The P&A system is a nationwide network of disability rights agencies, which are mandated and designated for every state and territory of the United States of America, under the DD Act, to investigate and remedy abuse and neglect of persons with developmental disabilities, and provide them with legal representation and advocacy services. *See*, 42 U.S.C. § 15043 (a)(2)(A)(i). The DD Act mandates that designated Protection and Advocacy systems such as the Disability Law Center have access to those individuals and their records. 42 U.S.C. § 15043 (a)(2)(I)(i)-(iii). The DD Act gives the P&A authority to ensure the protection of the rights of any individual with a developmental disability within the state, without regard to his or her living arrangement or location in which services are provided. 42 U.S.C. §15043(a)(2)(A)(i).

As part of its Congressional mandate, the DLC is authorized to investigate incidents of

abuse and neglect of individuals with developmental disabilities if it receives a complaint[1], or if there is probable cause[2] to believe that the incidents occurred. 42 U.S.C. §15043(a)(2)(B). The complaint and probable cause standards constitute two different legal standards, either one of which is sufficient to invoke P&A investigatory authority, including the right to access records. In the instant matter, DLC received a complaint to the system through Venilde Cabral. *Cabral Affidavit ¶18*. Mrs. Cabral informed the DLC about incidents of alleged abuse and neglect against her daughter, including improper restraint and denial of food and beverage, that occurred while her daughter was attending the Kennedy-Donovan Center School from approximately February 26, 2001 to August 1, 2002. The telephone call from Mrs. Cabral meets the oral reporting requirements of the regulatory definition. *Supra, at footnote 1*. DLC then was able to establish probable cause[3] after reviewing the letter of resignation of Patricia Campbell and interviewing five former KDCS employees who substantiated the allegations contained in the resignation letter. *Griffin Affidavit ¶ 11*. Based on the serious nature of the eye-witness accounts of improper

---

[1] Under the applicable regulations, a "complaint" is defined as: "Complaint includes but is not limited to any reports, whether formal or informal, written or oral, received by the system including media accounts, newspaper articles, telephone calls (including anonymous calls), from any source alleging abuse or neglect of an individual with a developmental disability." 45 C.F.R. § 1386.19.

[2] Under the applicable regulations, "probable cause" is defined as: "a reasonable ground for belief that an individual with a developmental disabilities has been, or may be, subject to abuse or neglect. The individual making such determination may base the decision on reasonable inferences drawn from his or her experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect. 45 C.F.R. § 1386.19.

[3] Protection and advocacy systems such as the DLC are "the final arbiter of probable cause for the purposes of triggering its authority to access all records for an individual that may have been subject to abuse or neglect." Arizona Center for Disability Law v. Allen, 197 F.R.D. 689, 693 (D. Ariz. 2000).

restraint and denial of food and beverage as a form of punishment, DLC found reasonable ground to support its belief that individuals with disabilities at KDCS have been, and may still be, subject to abuse and neglect in accordance with the regulatory standard noted above. *Campbell Affidavit ¶¶ 10-12 ; Forcier Affidavit ¶¶ 7, 11.* DLC thus meets meet both prongs of the legal analysis and is thereby authorized to investigate the alleged incidents of abuse and neglect, and to obtain records relevant to the investigation. 42 U.S.C. §15043(a)(2)(B).

### b. As part of its investigation, DLC has a right to contact information on guardians in addition to the release of records.

DLC, as the P&A, has a right to the names and contact information of all the students' guardians at KDCS, in addition to the release of records. 45 C.F.R. 1386.22 (a)(3)(i)-(iii); 45 C.F.R. 1386.22 (b),(c). In the case of Pennsylvania Protection & Advocacy, Inc. (PP&A) v. Royer- Greaves School for the Blind, 1999 WL 179797 (E.D. Pa. March 25, 1999), the Court held that the Pennsylvania Protection and Advocacy Inc. was entitled to a list of guardians provided by the school, even though the Protection and Advocacy Agency was unable to provide a sufficient basis of complaints or probable cause to warrant access, and the residents were not clients of the P&A. The Court ruled that even if there was reasonable grounds for denial of records, the facility still had to provide the P & A with the names and contact information for all of the students' guardians. *Id.* at *10. The Court acknowledged that this was a broad power for the P & A, but also that requiring the facilities to turn over the guardians' contact information made sense. *Id.* In order to obtain authorization, "the P & A must be able to contact the guardian. But if it does not have the guardians name and contact information, it cannot do so, leaving the P & A with no ability to obtain consent.[4] Requiring that the facility release the contact information remedies this

---

[4] The DD Act allows access to records without consent of a private non-state agency guardian as long as an effort was made to obtain consent, assistance was offered to resolve the situation and the guardian has failed or refused to act on behalf of the individual when the P&A has received a

8

dilemma." *Id.*

Similarly, in the instant case, KDC is obligated to turn over the guardian's contact information to the DLC. While the DLC has a right to this contact information without a sufficient basis of complaints or probable cause, in our case, DLC has received a complaint to the system, and has determined that there is probable cause. DLC thus meets the elements necessary to obtain the requested guardian contact information on several different legal bases.

### c. KDC's argument that release of the records to DLC is improper, is without merit.

KDC claims that is cannot release the records to DLC because of the IDEA and FERPA. *Griffin Affidavit,* ¶ 5, *Attachment No. 2*. However, case law holds that the P&A access authority prevails over FERPA's restrictions. The Court in <u>Michigan Protection and Advocacy Service v. Miller</u>, 849 F. Supp. 1202 (W.D. Mich. 1994), held that the defendant could not rely on FERPA or the IDEA to deny a P & A access to records it needed to conduct an investigation. The Court noted that, "[FERPA] does prohibit federal finding to educational institutions which permit the release of records without parental consent. The DD and PAIMI Acts, however, clearly mandate that organizations like [Michigan Protection and Advocacy System] have the authority to access DSS facilities and records in specific cases where the developmentally disabled and mentally ill individuals are involved. Defendant's reliance on the IDEA is misplaced." *Id.* at 1208.

Similarly, in the instant matter, as in <u>Miller</u>, the Disability Law Center, as the Protection and Advocacy agency for the Commonwealth of Massachusetts, is seeking access to records

---

complaint or has probable cause to suspect abuse or neglect. 42 U.S.C. §15043(a)(2)(I)(iii)(I)-(V). If the DLC is able to obtain the guardian contact information, as noted above, it can still access the records even if a guardian refuses to authorize release of such records. 45 C.F.R. 1386.22(a)(3)(i)-(iii). As held in <u>Disability Law Center v. Reil</u>, 130 F. Supp. 2d 294 (D. Mass. 2001), DLC as the designated Protection and Advocacy agency for the Commonwealth of Massachusetts, has access rights to records mandated notwithstanding the "good faith" refusal of guardians to authorize the release of such records.

9

regarding individuals so that DLC can pursue its investigation of allegations of abuse and neglect at the Kennedy-Donovan Center School. As the P&A, DLC has a duty of confidentiality under 45 C.F.R. 1386.22(e)(1)-(3), for any information obtained by a P&A about clients or potential clients, barring any disclosure of such information to third-parties. *See* <u>Wisconsin Coalition for Advocacy, Inc. v. Czaplewski</u>, 131 F. Supp.2d 1039, 1052 (E.D. Wisc. 2001) (Court ruled that the residents of a nursing home would suffer no privacy harm because of confidentiality restrictions on P & As.)[5]

Thus, DLC is likely to win on merits of this case because as part of its investigation, DLC has a right to the contact information on guardians. Additionally, DLC is bound by the confidentiality provisions of the DD Act, barring any third-party disclosure of such information and therefore there is no risk of any harm to the students' privacy. Consequently, KDC's reliance on state and federal statutes and regulations dealing with disclosure of student information is misplaced.

### 2. DLC and the Students at KDCS Will Suffer Irreparable Harm If DLC Does Not Receive the Records.

DLC cannot fulfill its statutory obligation to investigate allegations of abuse and neglect and provide protection and advocacy services if it cannot obtain the records from KDCS. Case law holds that denying a P & A access to records constitutes irreparable harm because "the P&A is being prevented from pursuing fully its right to access records ... in pursuit of its duty to investigate circumstances providing probable cause to believe abuse or neglect may be occurring." <u>Iowa Protection an Advocacy Services, Inc. v. Rasmussen</u>, 206 F.R.D. 630, 635 (S.D. Iowa. 2001);

---

[5] Notably, there appears to be one case holding otherwise; however, both the lower court's decision and the one page order from the appellate court, affirming the trial court decision, were unpublished with no precedential effect under the court's rules. <u>Washington Protection and Advocacy Svc v. Evergreen Sch. Dist</u>, (9th Cir. 2003) (P&A access authority did not trump FERPA's restrictions on releasing information). In addition, the Court's analysis was deficient because it did not address the fact that the regulations implementing the DD Act, 45 CFR 1386.22(i), themselves require that service providers turn over identities of guardians to P&As without any showing of probable cause.

*see also*, Wisconsin Coalition for Advocacy, Inc. v. Czaplewski, 131 F. Supp. 2d 1039, 1051 (E.D. Wisc. 2001); Advocacy Center v. Stalder, 128 F. Supp. 2d 358, 367-68 (M.D. La., 1999).

As a result of the barriers DLC faces due to KDC's refusal to release the records, DLC's function as a P & A is frustrated. If the records are not turned over to DLC, the investigation will take longer and potentially will be incomplete. *See*, Wisconsin Coalition for Advocacy, Inc. v. Czaplewski, 131 F. Supp. 2d at 1051. As noted in Advocacy Inc. v. Tarrant County Hospital District, 2001 WL 1297688, *4 (N.D. Tex, 2001),

> "When a facility… denies or places restrictions on an advocacy agency's access to records, the mandatory provisions relating to authority to investigate incidents of abuse and neglect are rendered nugatory. Mississippi Prot. & Advocacy Sys., Inc. v. Cotten, 929 F.2d 1054, 1059 (5th Cir. 1991). This not only hampers redress of past and current abuse and neglect, but has a detrimental effect on the advocacy agency's future performance of its statutory mandate. *Id.* Advocacy must have the authority to pursue legal, administrative and other remedies to ensure that the rights of the mentally ill are not violated. 42 U.S.C. 10805(a)(1). Timely access to records is essential for effective communication, Robbins v. Budke, 730 F. Supp. 1479 (D. N.M. 1990), and access to patient records is necessary for the P & A system to serve its clients, evaluate client concerns, and determine whether a client has a legal claim. *Id.*"

In addition, unless KDC is ordered to provide the documents and information requested by DLC, students at the school may continue to be irreparably harmed. The sooner the investigation can take place, the sooner potential future abuse or neglect can be prevented.

### 3. There Will Be No Privacy Harm to KDC and the Students at KDC Because There Will Be No Illegal Breach of Confidentiality.

KDC claims that it will be harmed because the confidentiality provisions of the IDEA and FERPA require that they cannot release a students records without authorization from their guardians. 20 U.S.C. §1232g(b). However, as stated above, the Miller case ruled that the release of records to a P & A was not a violation of the IDEA or FERPA and the facilities are still bound by the DD Act to provide the information when requested by the P&As. 849 F. Supp. at 1202.[6]

### 4. The Public Interest Will not be Harmed, But Rather Will be Furthered by DLC Having Access to the Records.

Congress drafted the DD Act because of the concern it had over instances of abuse of persons with developmental disabilities such as those contained in the allegations in the instant matter. It also acknowledged that in order to perform this function, P & As need access to a facility's records. 45 C.F.R.§ 1386(c). Allowing facilities to deny P & As access to their records would undermine the system. As the Court noted in Iowa Protection and Advocacy v. Rasmussen, "[t]o shield from independent review valuable records of this type of appraisal would directly contradict the expressly stated public policy of Congress." 206 F.R.D. at 635.

Allowing KDC to deny DLC the records is against the intent of Congress to improve conditions of those facilities like KDCS for persons with developmental disabilities. Given Congress' expressed intent, the public interest in preventing harm to students will be furthered by DLC having access to the KDCS records and thus outweighs any potential harm to the privacy interests of the students.

## CONCLUSION

For the reasons stated above, this Court should issue a preliminary injunction requiring

---

[6] Furthermore, even if KDC was prevented by the IDEA and FERPA from releasing the records without authorization, the DD Act specifically requires that KDC still release the names and contact information of the guardians. 45 C.F.R. §1386.22; see also, Wisconsin Coalition for Advocacy, 131 F. Supp. 2d at 1050; Pennsylvania Protection and Advocacy Inc, v. Houstoun, 228 F.3d 423, 428 (3rd Cir. 2000); Royer-Greaves at *10.

KDC to provide DLC with the names, addresses and telephone numbers of the guardians of the students at its school in New Bedford, Massachusetts, as well as any internal investigation reports relating to the allegations of abuse and neglect by staff against students. This Court should also issue a preliminary injunction forbidding KDC from interfering, in any way, with DLC's investigation.

Respectfully Submitted,

DISABILITY LAW CENTER, INC.
Plaintiff,

By attorneys,

6/8/04
Date

*Janine G. Solomon*

Janine A. Solomon, BBO# 567964
Disability Law Center, Inc.
11 Beacon Street, Suite 925
Boston, MA 02108
(617) 723-8455

*Matthew Engel J.S.*

Matthew Engel, BB0 #547465
Disability Law Center, Inc.
30 Industrial Drive, East
Northampton, MA 01060
(413) 584-6337

13