UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DISABILITY LAW CENTER<br>Plaintiff | )<br>)<br>)<br>) | |
| v. | )<br>)<br>) | CIVIL ACTION NO. 04-11248 JLT |
| KENNEDY DONOVAN CENTER, INC.<br>Defendant | )<br>)<br>) | |

DEFENDANT KENNEDY DONOVAN CENTER, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION
TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

STATEMENT OF FACTS

Kennedy Donovan Center, Inc. (hereinafter "KDC") is a Chapter 180, §501(c)(3)

corporation established to meet the diverse needs of a wide variety of disabled individuals.

Affidavit of Ann Taylor, ¶2 (hereinafter 'Taylor Aff."). One of the programs which KDC

operates is the Kennedy Donovan Center School (hereinafter "the School") located in New

Bedford, Massachusetts. Taylor Aff. ¶2. The School is an approved, private day school which

provides special education and related services to children between the ages of 3 and 22. Taylor

Aff. ¶2. The School is a member of the Massachusetts Association of Approved Private

Schools (hereinafter MAAPS). Taylor Aff. ¶3.

The School has held approval from the Massachusetts Department of Education to

provide special education and related services to special needs children for a number of years. In

the late 1990's, and into the year 2000, all approved private schools had to refile for approval by

the Department of Education, following the Department's issuance of a new, more detailed

approval process which coincided with the issuance of revised special education regulations by the Department of Education. Taylor Aff. ¶4. One of the criteria for approval was whether or not the private day or residential program had policies and practices consistent with the Individuals with Disabilities Education Act (hereinafter "IDEA"), as well as their state counterparts, the Massachusetts students records regulations and M.G.L.c, 71B, the special education statute. Taylor Aff. ¶5.

During the summer of 2002, a teacher at the School, Patricia Campbell, resigned her position with the School. Taylor Aff. ¶7 . In her letter of resignation, a copy of which is attached to her affidavit, she cited some concerns about practices at the School as well as the handling of certain students. Taylor Aff. ¶7. Despite being a mandated reporter pursuant to M.G.L.c. 119, §51A which requires teachers and school personnel to file complaints with the Department of Social Services (hereinafter "DSS") when they suspect abuse or neglect of children under the age of 17, Ms. Campbell did not file with DSS, nor did she bring her concerns to the attention of a supervisor/administrator at KDC until her letter of resignation was received. Taylor Aff. ¶7. She left work on the day she submitted her letter of resignation, and did not return to work thereafter. As a result of the letter of resignation, KDC's administrative personnel launched an investigation which included the interview of both staff and certain parents. Taylor Aff. ¶9. At no time did the parent file a complaint with KDC or with the Department of Education, specifically Program Quality Assurance Services. Taylor Aff. ¶11. In fact, at no time prior to the student's departure from the School, and her enrollment in another special education program, did the parent indicate that she had some concerns regarding the practices at the School or the treatment of her daughter. Taylor Aff. ¶¶11, 12.

2

KDC administrators thoroughly investigated the various allegations and promptly concluded. Taylor Aff. ¶9. As a result of this investigation, some staff members resigned, additional training and professional development were provided to staff members at the School and throughout KDC's programs, and KDC increased oversight into services and policies/procedures implemented at the School.

In December, 2003, Heidi Bettencourt, Program Director of the School, received a letter from Janine Solomon, Esq. of DLC in which she requested access to the names and addresses of all "guardians" of individuals serviced at the School. Taylor Aff. ¶13; Exhibit A. KDC turned the letter over to its counsel, Murphy, Hesse, Toomey & Lehane for reply. A series of letters, copied to KDC, were exchanged between DLC and Murphy, Hesse Toomey and Lehane. See Exhibits B - H, attached to the Taylor Affidavit. The crux of the dispute between DLC and KDC is highlighted by the exchange of letters between counsel; whether the Protection and Advocacy Agency, here DLC, has the right to access the records of children attending the School pursuant to IEPs developed pursuant to state and federal special education laws, and which are protected by both FERPA, as well as the Massachusetts students records regulations.

ARGUMENT

I.    PLAINTIFF IS NOT ENTITLED TO THE ISSUANCE OF A PRELIMINARY INJUNCTION BECAUSE PLAINTIFF CANNOT MEET THE CRITERIA FOR THE ISSUANCE OF AN INJUNCTION.

In determining whether a temporary restraining order or preliminary injunction should issue under Fed. R. Civ. Proc. 65, a federal district court in the First Circuit must review the following four factors: (1) the moving party's likelihood of success on the merits; (2) the

3

potential for irreparable harm; (3) a balancing of the relevant equities (comparing the hardship to the non-moving party if injunctive relief is granted with the hardship to the moving party if injunctive relief is not granted; and (4) the effect on the public interest of a grant or denial of injunctive relief.  Campbell Soup Company v. Giles, 47 F.3d 467 (1st Cir. 1995); Sunshine Dev., Inc. v. FDIC, 33 F.3d 106, 110 (1st Cir. 1994); Gately v. Commonwealth of Massachusetts, 2 F.3d 1221, 1224-25 (1st Cir. 1993); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4 (1st Cir. 1991).

The First Circuit has held that the first factor of the four-part analysis is critical to the granting of injunctive relief.  Narragansett Indian Tribe, supra, 934 F.2d at 6.; Public Service Company of New Hampshire v. Town of West Newbury, 835 F.2d 380 (1st Cir. 1987).  "We have often found this furcula to be critical."  Narragansett Indian Tribe, supra, at 6.

KDC concedes the existence of legal authority concerning the general right of a P & A agency access information concerning developmentally-delayed individuals under the Developmental Disabilities Act and Bill of Rights (hereinafter the DD Act), although there is only case interpreting the Act in the District of Massachusetts.  However, it is KDC's position that the statute relied upon, the DD Act, is applicable to the situation raised in the complaint and the accompanying documentation requesting a preliminary injunction for the following reasons:

1.    The School is not a residential facility;

2.    The School provides services to students with a broad range of disabilities, not just those students with "developmental disabilities" as identified in the DD Act;

3.    Because the School is an approved, private special education day school providing special education and related services to students whose programs are funded by LEAs, the provisions of the IDEA apply to the practices of the School.  Neither the IDEA nor FERPA permit access to records sought by the DLC.

4

4       In addition, it is KDC's contention that it would not be in the public interest to release this information to the DLC as the P&A for the Commonwealth of Massachusetts. Since the public interest is served by compliance with the IDEA and FERPA, which emphasize the role of the parent in all decisions concerning the child, to allow the DLC access to information, and possibly to conduct an investigation not supported by individual parents, would undermine and impede the IDEA and FERPA, and the purposes of those two statutes.

A.      The DLC Is Not Likely To Succeed On The Merits Of The Case.

1.      **The DD Act Does Not Apply To The Situation Presented Here, Namely, An Approved, Private Day School Servicing The Needs Of Students With A Wide Variety of Disabilities.**

The legal precedent cited by the DLC in its Memorandum of Law in Support of its

Motion for a Preliminary Injunction amply describes the genesis and the purpose of the DD Act.

"Disturbed by the inhumane and despicable conditions discovered at New York's Willowbrook

State School for Persons with Developmental Disabilities, Congress enacted the Developmental

Disabilities Assistance and Bill of Rights Act (hereinafter "the Act") to protect the human and

civil rights of this vulnerable population." (citations omitted). Alabama Disabilities Advocacy

Program v. J.S. Tarwater Developmental Center, 97 F.3rd 492, 494 (11th Cir. 1996); Arizona

Center For Disability Law v. James R. Allen, M.D., 179 F.R.D. 689, 692 (D. Ariz.2000). In

addition, the case law, the regulations and the statute itself make clear the origin of the P&A

system, as well as its scope of authority. Specifically, pursuant to the DD Act, a state cannot

receive federal funds for services to persons with developmental disabilities unless it has

established a P&A system. 42 U.S.C.§6042(a)(1). The funding to which that regulation refers is

not just any federal funding, but a specific grant program to distribute federal funds to assist

states in providing services to people with developmental disabilities. 42 U.S.C.§6025.[1] In this

case, there is no evidence that the School received any funding pursuant to the DD Act, although

it may receive, by way of pass-through from LEAs, federal funds pursuant to the IDEA.

Because of the origin of the DD Act, namely, Congress' reaction to conditions in a

residential facility for individuals with developmental disabilities, it is clear that the history and

purpose of the statute is to address the rights and conditions of those individuals who are in

residential facilities only.

> "In adopting the provision of the act mandating P &A access to
> facility residents, 42 U.S.C.§6042(a)(2)(H), Congress gave
> substance to its intent to 'assure that the most vulnerable
> individuals [institutionalized persons] who may not be able to
> contact the P &A system will have access to protection and
> advocacies services.' S.Rep.120, 103rd Cong., 1st Sess. 36,
> reprinted in 1994 U.S. Code Cong. Admin. News 164, 199.  In
> reauthorizing the act in 1984, Congress stated its intention that 'all
> developmentally disabled persons who reside in facilities for
> developmentally disabled persons [] be eligible for services from
> the protection and advocacy system." Alabama Disabilities
> Advocacy Program, supra, at 497.

A review of the pertinent case law has not identified any case where the facility involved

was **not** a residential facility, and only a day placement. So, for example, in Mississippi

Protection and Advocacy System, Inc., v. Cotten, 929 F.2d 1054 (5th Cir. 1991).  The institution

at issue was a "state-owned and operated facility for approximately 250 adult residents who

suffer from mild to profound mental retardation."[2]  Other cases support this interpretation of the

---

[1]It is important to remember that the IDEA has its own funding mechanism, and as an
entitlement grant to state and local educational agencies, mandates a compliance mechanism
which is quite different from the compliance mechanism found in the DD Act.

[2]It is interesting to note that in most of the cases the facility is not a facility for children,
but rather an adult facility.  Thus, the overwhelming number of cases involving the applicability

DD Act. See, <u>Iowa Protection and Advocacy Services, Inc. v. Gerard Treatment Programs,</u>

<u>L.L.C.</u>, 152 F. Supp.2d 1150 (N.D. Iowa 2001) (residential psychiatric medical institution); <u>Iowa</u>

<u>Protection and Advocacy Services, Inc. v. Rasmussen</u>, 206 F.R.D. 630 (S.D. Iowa 2001)(certified

health care facility serving persons with mental retardation–the individual was a resident of the

facility); <u>Wisconsin Coalition for Advocacy, Inc.v. Kay Czaplewski</u>, 131 F. Supp.2d 1039 (E.D.

Wisc. 2001)("various institutions providing services to people with disabilities"–in that case the

issue involved a "resident"); <u>Advocacy Incorporated v. Tarrant County Hospital District</u>, 2001

W.L. 1297688 (N.D. Tex.)(psychiatric facility housing residents); <u>Pennsylvania Protection and</u>

<u>Advocacy, Inc. v Houstoun</u>, 228 F.3rd 423 (3d Cir. 2000)(case arose under PAMII and involved

a psychiatric facility); <u>Pennsylvania Protection and Advocay, Inc. v. Royer-Greaves School for</u>

<u>Blind</u>, 1999 WL 179797 (E.D.PA.)(school has approximately 20 residents)[3]; <u>Michigan Protection</u>

<u>and Advocacy Service, Inc. v. Miller</u>, 849 F.Supp. 1202 (W.D. Mich. 1994) (facilities which

"house" individuals with developmental disabilities and mental illness).

Thus, it is KDC's contention that the case law overwhelmingly shows that the DD Act's

reach was limited to those institutions which receive, directly or indirectly through state funding

pursuant to the DD Act, and which are residential facilities where developmentally disabled

individuals, sought to be protected by the Act, are "institutionalized". As the affidavit of Ann

---

of the DD Act involve residential facilities solely for adults. Further, in the few cases which deal
with residential facilities for children, the implication is that the children are wards of the state
with no parent, but only a guardian. Clearly, the School is not a residential facility for adults and
the students, for the most part, have parents and are not wards of the state.

[3]Although the court indicates that Royer-Greazes School is a non-profit entity that
provides special education to multi-handicapped, mentally challenged blind students, the issue of
the impact and interrelationship with the IDEA apparently was never raised in that case.

Taylor indicates, this is not the School. The School is a day school, much like a public school except for the population it serves, which provides special education and related services to children who return home to their parents, guardians, or foster parents at the end of the day.

The case law addressing the access provisions of the DD Act also support the contention that the DD Act only applies to residential facilities. As the court is aware, 42 U.S.C. §6042 (a)(2)(I) describes the access of the P&A system to certain records held by the institution. As (iii) indicates, the P&A system may gain access to information concerning individuals with developmental disabilities, even if the "legal guardian, conservator, or other legal representative"[4] denies access to those records. However, those courts dealing with this specific provision of the DD Act, have indicated why Congress, and thus the courts, have enforced this right to access despite the lack of, or refusal to, consent by the legal guardian of the developmentally delayed individual.

> "Since children living in institutions necessarily live away from their parents, the most involved and concerned parents cannot observe the majority of events experienced by their children in institutions. Institutionalized people with disabilities are by-and-large under the exclusive control of facility staff. . .these long-distance family ties would operate to suggest that legal guardians have even less control over their wards, and consequently less reason for extending that control after the ward has died."
>
> We have no reason to doubt that the families of G.A. and M.V. are concerned and caring parents who did what they believed best for their children. . . ".Alabama Disabilities Advocacy Program, supra, 97 F.3d 492 at 498, footnote 3, cited in Disability Law Center, Inc. v. Riel, 130 F.Supp. 2d 294 (D.Mass. 2001).

Therefore, KDC respectfully submits that the provisions of the DD Act do not apply to

---

[4]It is important to note that the word "parent", which is not the same as the words identified in (iii), is not one of the categories.

the School, or the situation here, because the School is not a residential facility to which the P&A

system can have access within the terms of that statute. Rather, it is KDC's contention that

access to the information requested can only be provided if disclosure is in compliance with the

IDEA and FERPA.

2.    **The School Provides Services to Students With a Borad Range of Disabilities, Not Just Those Students With Developmental Disabilities AsDefined in the DD Act, And Therefore, The DD Act Does Not Apply And Does Not Permit Access to Student Records Without the Written, Informed Consent of the Students' Parents or Guardians.**

As indicated in the Affidavit of Ann Taylor, the School provides special education and

related services to students with a wide array of disabilities, as defined by the IDEA. Further, as

the reference page from the Directory of Member Schools of MAAPS indicates, these disabilities

covers a wide gamut including behavioral disorder, physically handicaps, medical fragility, and

cerebral palsy and then disabilities which would likely fit into the category of developmental

disabilities, namely developmentally disabled students and severely mentally retarded students.

The P&A system of Massachusetts has the right to investigate, advocate for and have

access to information only as defined by the enabling statute, the DD Act. Under the DD Act, the

DLC is committed to provide services as the P&A system to those who are developmentally

disabled. 14 U.S.C. §15002(8) defines developmental disability; the court should note that the

definition is different than that contained in the IDEA. The definition of developmental

disability states the following:

> "The terms' developmental disability' means a severe, chronic
> disability of an individual that–(i) is attributable to a mental or
> physical impairment or a combination of mental and physical
> impairment; (ii) is manifested before the individual attains age 22;
> (iii) is likely to continue indefinitely; (iv) results in substantial

> functional limitations in three or more of the following areas of
> major life activity: (I) self-care. (II) receptive and expressive
> language. (III) learning. (IV) mobility. (V) self-direction. (VI)
> capacity for independent living. (VII) economic self-sufficiency;
> and (v) reflects the individual's need for a combination in sequence
> of special, interdisciplinary, or generic services, individualized
> supports, or other forms of assistance that are of a lifelong or
> extended duration individually planned and coordinated."

Although the definition of developmental disability appears to apply to more than just mentally

retarded individuals, it is clear that the purpose of the Act was to address the condition of those

individuals with mental retardation. For example, 42 U.S.C.§15001 refers to the President's

Committee on Mental Retardation, established by the Executive Order No. 11280 on May 11,

1966 and refers to that Committee as having organized " national planning, simulated

development of plans, policies and programs, and advanced the concept of community

participation in the field of mental retardation." In addition, the Act goes on to make continuing

references to the category of mental retardation and the functions of the Act itself. In fact, in one

of the first cases to address the scope of the Act, U.S. v Solomon, 419 F. Supp. 358 (D Md.

1976), aff'd, 563 F. 2d 1121, the court concluded what Congress did not intend or expect as a

result of this statute, and makes specific reference to mental retardation only.

> "Congress did not intend or expect that while an elaborate plan to
> improve the lot of the mentally retarded was being implemented by
> one federal agency, namely, the Department of Health, Education
> and Welfare with expertise in the field of mental retardation,
> another governmental agency, the Department of Justice, with no
> expertise in the solution of the very difficult problems posed by
> mental retardation, could simultaneously make wholesale attacks
> on a state's mental retardation programs under the guise of
> protecting Thirteenth and Fourteenth Amendment rights."[5]

---

[5]This quotation is also interesting because it established the Department of Health
Education and Welfare as "the expert in the field of mental retardation. However, in the case of

In this case, as clearly established in both the affidavit of Ann Taylor as well as the excerpt from the MAAPS Directory, the School services students with a wide variety of disabilities, some of which may include developmental disabilities, but which do not necessarily involve developmental disabilities. Based upon the record before the court, it is not clear at all that the DD Act, which has as its purpose funding as well as a P&A system, but limited to those individuals with developmental disabilities, applies in this circumstance. In view of that fact, it is the contention of KDC that the court cannot find that the DLC will be successful on the merits of the case in this situation. Therefore, the court should not issue the requested injunction.

3.    **The Provisions Of The IDEA And FERPA Bar The Disclosures Requested By The DLC.**

It is axiomatic as a matter of statutory construction that, when there is a more specific statute, the more specific statute shall apply, rather than a more general statute. See, e.g., Edmond v. U.S., 520 U.S. 651(1997)(Ordinarily, where a specific statutory provision conflicts with a general one, the specific statutory provision controls.); Bulova Watch Co. V. U.S., 365 U.S. 753 (1961)(a specific statute controls over a general one without regard to priority of enactment); Vimar Seguros Y Reaseguros, S.A. v. M/V Sky Reefer, 29 F. 3d 727 (1st Cir. 1994)(The court held that the Federal Arbitration Act controlled over the Carriage of Goods by Sea Act because the FAA more specifically addressed the issue at hand.); Skerry v. Mass. Higher Educ. Assistance Corp., 73 F. Supp. 2d 47 (D. Mass. 1999); U.S. v. Sadlier, 649 F. Supp. 1560 (D. Mass. 1986)( The court held that where Congress has enacted two statutory schemes which

---

the school, it is actually both the federal and the state departments of education which have expertise in the provision of services to students with all disabilities including those students with developmental disabilities.

11

arguably embrace the same subject matter, the more specific statute should apply, to the exclusion of the more general statutory provision.) Even if this court were to find that the DD Act does apply in this situation, despite the foregoing arguments of KDC, it is KDC's contention that, since the students at the School are on IEPs, funded by LEAs, where KDC provides educational and related services as a result of the IDEA and its Massachusetts counterpart, M.G.L.c. 71B, the provisions of the IDEA and FERPA, which control the retention, access to and the confidentiality of, educational records, is applicable, not the DD Act.

As indicated in the Affidavit of Ann Taylor, the School is an approved, private day school. As a private school, it must provide educational and related services consistent with the provisions of the IDEA and FERPA. In 2000, the Massachusetts Department of Education substantially revised its special education regulations, following the substantial revision of regulations done by the federal Department of Education, resulting from the Reauthorization of the IDEA in 1999. Part of those Massachusetts regulations specifically address the approval of private schools like the School. The regulations specify the conditions under which the School must operate in order to maintain its approval. 603 CMR §28.06 describes the TEAM process for determining placement. In 603 CMR 26.06 (3), the Department of Education outlined the general requirements for out-of-district placements. An out-of-district placement is defined under 603 CMR §28.02(14) as "a special education program located in a building or facility outside of the general education environment that provides educational services primarily to students with disabilities and shall include all programs approved under 603 CMR §28.09". The specific provision of 603 CMR §28.06(3) states, for example, that "For the duration of any student's placement in an out-of-district setting in Massachusetts, the Administrator of Special

12

Education [at the local level] shall make a good faith effort as required by 34 CFR 300.350 to ensure that the student's IEP is being appropriately implemented, and that service delivery in an out-of-district setting is aimed at assisting the student to meet the goals identified on the student's IEP". Thus, the introductory paragraph alone references the federal regulations implementing the IDEA. In addition, the regulation indicates that it is the Department of Education that monitors and has oversight over the policies, procedures and appropriately credentialed staff of a private school. In addition, the LEA is required to monitor the programs of individual students as well. Under paragraph (c), the regulations specifically state that "a student's right to full procedural protections: School districts that place eligible students in out-of-district programs retain full responsibility for ensuring that the student is receiving all special educational and related services in the student's IEP, as well as all procedural protections of law and regulation, including but not limited to those specified in Section 28.09 of these regulations." The procedural protections include those derived from state law, as well as federal law. In 603 CMR §28.09, the introductory paragraph specifically says that "Approval [of the school] does not relieve special education schools of their obligations to comply with other applicable state or federal statutory or regulatory requirements or requirements set forth in their contracts with referring agencies." The provisions of 603 CMR §28.06 also make it evident that it is the Department of Education which should be involved in any issues or allegations about the safety and/or potential abuse at an approved, private special education school. See, Section 28.06 ¶4(4)(a). In addition, in subparagraph 10, the Department has specifically provided that approved special education schools "Shall keep current and complete files for each publicly funded enrolled student, shall manage such files consistent with the Massachusetts student

13

records regulations at M.G.L.c. 71§34H. As the court is well aware, these particular provisions are required by FERPA itself which requires states, as a condition of receipt of federal education funds, to have appropriate regulations dealing with access to, and the confidentiality of, student records.

Criterion 3.1(a) of the Policies and Procedures Manual of the Massachusetts Department of Education for the approval of private schools, implementing 603 CMR §28.09(11)(d), specifically states that the out-of-district program must have a program manual that has policies and procedures in all areas including IEP revisions and changes, parent involvement and student records, among a number of required policies. Under Criterion 3.34 for the approval of a private school, it indicates that the policies and procedures manual, required to be kept by the private school, must include, and be readily available to parents and staff, the IDEA regulations and Appendix A to the federal regulations. Criterion 12.12 of the Policies and Procedures Manual requires annual in-service training which must include training in "student record policies and confidentiality issues." Thus, it is clear that the School, as an approved special education day school in Massachusetts, is subject to a panoply of federal statutory and regulatory requirements in the administration of its program.

It is KDC's contention that the federal and state laws under which it is required to run its educational programs do not permit KDC to release the desired information to the DLC as the P&A of Massachusetts. In contrast to <u>Disability Law Center, Inc. v. Riel</u>, 130 F. Supp. 2d 294 (D. Mass.2001) in which Judge Saris allowed the DLC access to records of a 50-year old woman with mental retardation and other developmental disabilities residing at the Glavin Regional Center, even though the guardian did not give consent and had refused, in good faith, to give

consent, the situation at the School is quite different.  In <u>Riel</u>, there was no federal statute cited

by the Commissioner which would have precluded the release of these records over the

guardian's refusal.  This is in marked contrast to the IDEA and FERPA, which is referenced in

the IDEA as protecting the confidentiality of student records and the need for parents' consent

prior to the release of any personally-identifiable information.  20 U.S.C.§1417 specifically states

the responsibilities of the Secretary of Education include the responsibility that he/she must "take

appropriate action, in accordance with the provisions of Section 1232(g) [FERPA] of this title, to

assure the protection of the confidentiality of any personally identifiable data, information, and

records collected or maintained by the Secretary and by state and local educational agencies

pursuant to the provisions of this subchapter.  Pursuant to that section, the Department of

Education has issued specific regulations concerning the confidentiality of information.

Specifically, 34 CFR §300.560, et seq describes the parental rights to, access to, and most

importantly, the confidentiality, of information contained in the child's educational records.

Section 300.571 of the regulations state that "parental consent must be obtained before

personally identifiable information is–(1) disclosed to anyone other than officials of participating

agencies collecting or using this information or (2) used for any purpose other than meeting a

requirement of this part."  This regulation makes clear that no disclosure can take place unless

there is written informed consent of the parent or it meets one of the exceptions found under

FERPA.  For its part, 20 USC §1232(g) (FERPA) specifies the exceptions to the requirement for

written informed consent, none of which is applicable here.  However, generally, Section

1232(g)(b)(1) bars the release of education records (or personally identifiable information

contained therein other than directory information as defined in paragraph 5 of subsection (a) of

the section) of students without the written informed consent of their parents to any individual,

agency or organization. Thus, Massachusetts, as a recipient of federal funds, as well as every

LEA in the state of Massachusetts, and by Massachusetts regulation, every approved private

special education school, cannot permit the release of education records or personally identifiable

information unless there is written informed consent or there is an exception as listed in the

regulations. One of the specific exceptions is the release of names and addresses pursuant to the

provision which allows an entity to release "directory information". However, as the statute

makes clear, directory information may only be released if there is a specific notice contained in

the policies and/or procedures of an agency that it does release directory information without

parental consent. Thus, there are specific statutory and regulatory provisions which prohibit the

School from releasing the information sought by the DLC.

Further, unlike <u>Riel</u>, decided under the DD Act, the IDEA makes it very clear that

parental rights are paramount, and cannot be overridden. As early as <u>Board of Education of the</u>

<u>Hendrick Hudson Central School District v. Rowley</u>, 458 US 175, 205-206 (1982), the courts

have recognized that parents are key to the education of their children: "It seems to us no

exaggeration to say that Congress placed every bit as much emphasis upon compliance with

procedures giving parents and guardians a large measure of participation at every stage of the

administrative process . . .as it did upon the measurement upon the resulting IEP against the

substantive standard."

> "The Education of the Handicapped Act (EHA), 84 Stat. 175, as
> amended, 20 USC §1400 et seq. (1982 ed. and Supp. V.) enacts a
> comprehensive scheme to assure that handicapped children may
> receive a free public education appropriate to their needs. To
> achieve these ends, the Act mandates certain procedural

16

> requirements for participating state and local educational agencies.
> In particular, the Act guarantees to parents the right to participate
> in the development of an 'Individualized Education Program' (IEP)
> for their handicapped children and to challenge the appropriateness
> of their child's IEP in an administrative hearing with subsequent
> judicial review." <u>Dellmuth v. Muth</u>, 491 U.S. 223, 229 (1989).

The courts have traditionally recognized the comprehensive nature of the procedures and

guarantees set out in the IDEA, and its former counterpart, the EHA, and in light of the

comprehensive nature of the IDEA's procedures and guarantees, it is the exclusive avenue for

addressing issues raised in the context of the provision of special education to an special needs

students.  In <u>Weber v. Cranston School Committee</u>, 212 F.3rd 41, 51 (1st Cir. 2000), the First

Circuit emphasized this by stating the following:

> "The IDEA statement of purpose specifically recognizes the
> statute's mission 'to assure that the rights of children with
> disabilities and parents of such children are protected'. . .the statute
> establishes an elaborate mechanism for parental involvement by
> designating parents as part of the TEAM (citation omitted),
> requiring revision of the IEP to address information provided either
> by or to parents regarding their child's educational needs and
> services (citation omitted) and mandating that the parents must be
> 'members of any group that makes decisions on the educational
> placement of their child,' id. §414 (f).  In addition to extensive
> procedures for parental involvement in the [IEP], IDEA also
> ensures the central role of parents by requiring parental consent to
> educational evaluations, assigning a surrogate parent to 'protect the
> rights of the child' when the child's parents are not known or
> cannot be located. . .and mandating 'an opportunity for the parents
> of a child with a disability to examine all records relating to such
> child.'"

See also, <u>Frazier v. Fairhaven School Committee</u>, 276 F.3rd 52, 58 (1st Cir. 2002).  ("The IDEA

contains a panoply of procedural safeguards designed to assure that the parents will have

meaningful input into decisions that affect the education of children with special needs.  These

include the right of parents to examine all records. . ."); Amanda J. v. Clark County School

District, 267 F. 3rd 877, 891 (9th Cir. 2001)("The critical nature of the provisions [of IDEA]

protecting parents' involvement is highlighted when they are considered in light of the purposes

of the IDEA. . [T]hose individuals who have first-hand knowledge of the child's needs and who

are most concerned about the child must be involved . . .")

      FERPA places just as much emphasis on the importance of parent involvement and

parental consent as does the IDEA. In Frazier v. Fairhaven School Committee, supra at 67-68,

the First Circuit Court of Appeals quoted the Congressional Record when indicating that

"Congress enacted FERPA to assure parents of students . . . access to their educational records

and to protect such individuals' rights to privacy by limiting the transferability of their records

without their consent.". . .Under its terms, educational institutions with a few exceptions not

material here, must obtain written parental consent prior to releasing student records or

information derived therefrom." In Warner v. St. Bernard Parish School Board, 99 F. Supp. 748,

752 (E.D. LA 2000), the court noted that pursuant to FERPA, a parent has an expectation of

privacy in her child's educational records because the statute provides that such records will not

be released without written parental consent. See, also, Sean R. v. Board of Education of the

Town of Woodbridge, 794 F. Supp. 467 (D.Conn. 1992)(Learning disabled student and his

parents sued the school board alleging release of confidential information in violation of right to

privacy secured by due process clause and the IDEA. There the court held that plaintiffs had a

reasonable expectation of privacy based upon the IDEA). See, also. Webster Grove School

District v. Pulitzer Publishing Company, 898 F.2nd 1371, rehearing denied (8th Cir. 1990).

      As the courts have made clear, the scope of the IDEA is indeed broad. The First Circuit

has indicated that any claim that involves or implicates the IDEA at all must go through the administrative procedures established pursuant to the IDEA. See, Frazier v. Fairhaven School Committee, supra. Further, it is clear that it is a broad brush that applies. In Bowden v. Dever., 2002 W.L. 472293 (D.Mass.), Judge Woodlock dealt with a motion to dismiss a complaint filed by the parents on behalf of their minor, autistic children, challenging the alleged psychological and physical abuse of the children by teachers and/or instructional aides of the Barnstable Public Schools. In that case, the parents argued that their claims were not subject to exhaustion of administrative procedures because the underlying allegations involved physical abuse, which is non-educational, rather than a lack of educational services. In response, the court said:

> "However, the distinction between educational and non-educational impediments to an equal education makes no difference. The IDEA guarantees every disabled child a free and appropriate public education. Since the school provides those custodial and educational services, its treatment of a student's disability will necessarily encompass both educational and non-educational services. . ., and it may be impossible to distinguish them completely. Hayes v. United School District No. 377, 877 F.2d 809-813 (10th Cir. 1989)."

In Hayes, supra, the court stated the following in response to a parental challenge of the use of short-term suspensions and a timeout room to control a student's behavior :

> "The EHA requires the parents of children be given '*an opportunity to present complaints with respect to any matter relating to* . . .the provisions of a free appropriate public education'20 USC §1415 (b)(1)(E)(emphasis added). The state or local educational agency charged with the administration of the program is required to conduct 'an impartial due process hearing' concerning such complaints. . .Here, the school's use of the timeout room is clearly related to providing an appropriate public education for the plaintiff." 877 F.2nd at 813.

Thus, it is KDC's contention that the more specific provisions, procedures, protections,

and guarantees codified in the IDEA, and by reference, FERPA, are applicable to this situation, rather than the DD Act. Both the IDEA and FERPA not only emphasize the importance of parental involvement, with extensive procedural guarantees of such involvement, but also the importance of maintaining the confidentiality of personally identifiable information of a student. If the School were to comply with the request of the DLC to hand over the names and addresses of guardians, and by implication the children, without parental consent, it would fly in the face of both the IDEA and FERPA which bars release of records without written informed parental consent. Further, the justification for access by the P&A system of Massachusetts to records, despite the lack of consent or even the refusal of consent, such as in Riel, supra, is inconsistent with the emphasis on parental involvement/control in the overall procedures and guarantees codified in the IDEA. Since the School was mandated to abide by the provisions of the IDEA as an approved private school providing special education and related services, the court must deny the request for a preliminary injunction.

A.    THE PUBLIC INTEREST IS NOT SERVED BY THE RELEASE OF THE REQUESTED RECORDS.

Although it is KDC's contention that it cannot release the records sought by the DLC, and that the law is consistent with the position of KDC, it also is not in the public interest to release those records to P&A. As indicated above, with the emphasis on the role of parental involvement in development and the implementation of all aspects of a child's IEP, it is clear that to allow access to information without parental consent is not consistent with the overall purposes of the IDEA and FERPA. Clearly, since Congress has identified the public interest as the increased role of parents in the provision of special education and related services to their

20

children, see 20 U.S.C. §1400 ("the purposes of this chapter are (B) to ensure that the rights of children with disabilities and the parents of such children are protected. . .", then it could not serve the public interest to issue an injunction which flies in the face of the public interest established by the court, namely, parental involvement.

Finally, although the DLC claims that the release of records and access to the program it desires would harm KDC in any way, the reality is that it would. As noted above, the unauthorized release of records can be legally actionable and problematic in terms of the School's maintenance of its approved status.

## CONCLUSION

For all of the foregoing reasons, KDC respectfully requests that the court deny the injunction requested by the DLC.

Respectfully submitted,
DEFENDANT KENNEDY DONOVAN CENTER, INC.
By Its Attorney,


Regina Williams Tate, BBO #492780
Murphy, Hesse, Toomey & Lehane, LLP
300 Crown Colony Drive, P.O. Box 9126
Quincy, MA 02269-9126
Telephone: (617) 479-5000

Dated: July 26, 2004

## CERTIFICATE OF SERVICE

I, Regina Williams Tate, hereby certify that I have this day forwarded a copy of the foregoing document to Janine A. Solomon, Esq., Disability Law Center, 11 Beacon Street, Suite 925, Boston, MA 02108 and Matthew Engel, Esq., Disability Law Center, Inc., 30 Industrial Drive East, Northampton, MA 01060, attorneys for Plaintiff Disability Law Center, Inc.


_____
Dated

Regina Williams Tate

21