SCANNED

DATE 08/05/04

SKY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DISABILITY LAW CENTER, INC.,       )
                                   )
            Plaintiff,             )
                                   )
v.                                 )       CIVIL ACTION NO. 04-11248 JLT
                                   )
KENNEDY-DONOVAN CENTER, INC.,      )
                                   )
            Defendant.             )

## PLAINTIFF'S REPLY MEMORANDUM TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### A. THE DEVELOPMENTAL DISABILITIES ACT APPLIES TO THE STUDENTS AT THE KENNEDY DONOVAN CENTER.

Congress enacted the Developmental Disabilities Assistance and Bill of Rights Act (DDA), 42 U.S.C. §§ 6000-6083, in response to the horrific conditions in large institutions for people with developmental disabilities. As part of the DDA, the federal government gave money to every state in order to assist states in providing better services to persons with developmental disabilities. 42 U.S.C. § 6025. As a condition for this financial support, the DDA required that each state establish a Protection and Advocacy System (P&A). P&As are specifically authorized to investigate reports of abuse and neglect concerning persons with developmental disabilities, and more generally to provide advocacy services to this same population, including litigation. 42 U.S.C. § 6042.

1. The Developmental Disabilities Act Applies to Individuals Who are not Mentally Retarded.

The definition of developmental disability in the DDA is intended to be a broad and

functional one, based upon consideration of multiple factors.  In Defendant Kennedy Donovan

Center Inc.'s Memorandum of Law in Support of its Opposition to Plaintiff's Motion for a

Preliminary Injunction (Defendant's Memo), the defendant, while conceding that the definition

of developmental disability (DD) is broader than the definition of  mental retardation (MR), tries

at the same time to argue that the DD definition somehow only applies to people with MR.

Defendant's Memo at 9, 10.  Notably, the statutory definition states in pertinent part:

> "The term 'developmental disability' means a severe, chronic
> disability of an individual that-(i) is attributable to a mental
> **or physical** impairment or a combination of mental and physical
> impairment;

(emphasis added). 42 U.S.C. § 15002(8).

There is no dispute that the impetus for the enactment of the DDA thirty years ago was

primarily driven by the sorry plight of institutionalized individuals with mental retardation.

However, this historical background does not, and cannot, lead to the conclusion that the DDA's

developmental disability definition applies exclusively to people who are mentally retarded.

Under the heading of Populations Served, a Kennedy Donovan Center, Inc. (KDC) document

attached to the Affidavit of Ann Taylor lists nine different categories of disabilities.  One of these

categories is Severely Mentally Retarded, while another category is Developmentally Disabled.

Thus, KDC's own exhibit makes clear that the two categories are not synonymous.  Further

support for the plaintiff's position is reflected in a document of  Massachusetts' own Department

of Mental Retardation (DMR) entitled Department of Mental Retardation Strategic Plan,

appended to this Memorandum as Exhibit A.  One of the strategic objectives is to explore "[t]he

ramifications of expanding or limiting the Department's eligibility to developmentally disabled

2

children and adults without mental retardation." *Id*. at 11. Thus, the DMR views the DD definition to be distinct from, and broader than the MR definition. Finally, in the recent case of *Tennessee P&A Inc. v. Wells*, 371 F.3d 342 (6th Cir. 2004), the court, in a careful and thorough analysis of the issue, concluded that there is a broad functional definition of developmental disabilities in finding that the DDA covered individuals with traumatic brain injuries. *Id* at 345-351.

    2. <u>All of the Students at the Kennedy Donovan Center Have Developmental Disabilities</u>.

The complete list of different disability classifications of students at KDC is as follows: "Multiply Handicapped, Developmentally Disabled, Cerebral Palsy, Medically Fragile, Severely Mentally Retarded, Autistic, Physically Handicapped, Behaviorally Disordered and Pervasive Development Disorder (PDD). Attachment to Affidavit of Ann Taylor. The definition of developmental disability is:

> "The term "developmental disability means a severe, chronic disability of an individual that-(i) is attributable to a mental or physical impairment or a combination of mental and physical impairment; (ii) is manifested before the individual attains age 22; (iii) is likely to continue indefinitely; (iv) results in substantial functional limitations in three or more of the following areas of major life activity; (I) self-care. (II) receptive and expressive language. (III) learning. (IV) mobility. (V) self direction. (VI) capacity for independent living. (VII) economic self-sufficiency; and (v) reflects the individual's need for a combination in sequence of special, interdisciplinary, or generic services, individualized supports, or other forms of assistance that are of a lifelong or extended duration individually planned and coordinated."

42 U.S.C. § 15002(8).

The nine categories of disability referenced in the KDC publication all encompass severe disabilities which profoundly affect functioning level and skill development for these individuals.

Thus, it appears highly doubtful that any of KDC students would not have functional limitations in three or more of the major life activities delineated in the definition of developmental disability. Since the ages of the students are between 3 and 22, (Defendant's Memo at 1), their disabilities have clearly manifested before the age of 22. Their need for services will not cease when they turn 22. KDC is a private special education day school approved by the Massachusetts Department of Education. *Id.* The substantial cost of sending a student to KDC or other similar schools is paid for by local school districts. Under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 et seq., local school districts are only allowed to pay for these private school placements in cases where the severity of the student's disability causes the district to decide that the student cannot be served within its public schools. Thus, KDC's assertion, unsupported by any evidence or discussion, that not all of its students are developmentally disabled, is not credible.[1]

### 3. The DDA is Intended to Protect Individuals with Developmental Disabilities in any Setting and Living Situation.

The defendant's argument that the protections of the DDA apply only to individuals placed in large residential facilities is also without merit. The DD Act does not limit P&A

---

[1] Even assuming, arguendo, that some of the KDC students do not have developmental disabilities, DLC would still have access rights to the records it is seeking. In 1986, most of the provisions of the DDA were extended to people with mental illness under the Protection and Advocacy of Mentally Ill Individuals Act (PAIMI), 42 U.S.C. §§ 10801-10851. Subsequently in 1992, Congress enacted the Protection and Advocacy for Individual Rights Program (PAIR), 29 U.S.C. § 794e, to serve persons with disabilities who are not eligible under either the DDA or PAIMI Act. The access provisions of PAIMI and PAIR are either identical to, or similar to, the access provisions of the DDA. DLC is the designated Protection & Advocacy Agency for Massachusetts under all three programs - Protection and Advocacy for Persons with Developmental Disabilities (PADD), Protection and Advocacy of Mentally Ill Individuals Act (PAIMI) and Protection and Advocacy for Individual Rights Program (PAIR).

4

investigative access rights to any particular setting (e.g. residential facilities). Moreover, the DD

Act gives the P&A authority to ensure the protection of the rights of any individual with a

developmental disability within the state, **without regard to his or her living arrangement or**

**location in which services are provided**. (emphasis added).  42 U.S.C. § 15043(a)(2)(A)(i).

It is well established that the national trend is moving towards providing services to

people with developmental disabilities in the community.  The defendant cites the case of

*Alabama Disabilities Advocacy Program v. Tarwater Developmental Center*, 97 F.3d 492, 497

(11th Cir. 1996), to argue that in passing the DDA, Congress' legislative intent was to

protect institutionalized persons (referencing 42 U.S.C. § 6042(a)(2)(H)).  Defendants Memo at

6.  This argument, however, does not reflect that the relevant part of the statute was amended in

2000.  In response to the trend towards de-institutionalization, Congress specified that P&As

should have "access...to any individual with a developmental disability in a location in which

services, supports, and other assistance are provided..."  42 U.S.C. § 15043(a)(2)(H).

## B. P&A ACCESS AUTHORITY OVERRIDES THE PRIVACY PROTECTIONS OF FERPA.

### 1.  The P&A Statute Preempts Many Privacy Rights, including FERPA.

Courts have held that the P&A access rights preempt the provisions of

other confidentiality statutes.  Thus in the case of *Center for Legal Advocacy v. Hammons*, 323

F.3d 1262 (10th Cir. 2003), the Court held that P&A access preempts state privacy laws.

Similarly, in *Iowa Protection & Advocacy Services, Inc. v. Rasmussen*, 206 F.R.D.

630, 639-42 (S.D. Iowa 2001), the District Court ruled that P&A access authority to review

records trumps claims of attorney-client privilege and conflicting state law.

On the specific issue of P&A access and FERPA confidentiality issues, the case most

directly on point is *Michigan Protection and Advocacy Services, Inc. v. Miller*, 849 F. Supp 1202

(W.D. Mich.1994). *Miller*, cited in plaintiff's Memorandum of Law In Support of Motion for a

Preliminary Injunction (Plaintiff's Memo at 9), holds in favor of P&A access, and defendant has

not offered any reason as to why *Miller* should not be considered persuasive authority.

As a preliminary matter in reviewing the *Miller* case, it should be noted that, contrary to

defendant's argument,  the IDEA does not contain greater privacy rights than those contained in

FERPA.  The IDEA regulations make clear that where consent to the release of records is not

required by Section 99 of FERPA, consent is also not required under the IDEA.

34 C.F.R. § 300.571 (b).

In *Miller*, the District Court held that a state juvenile agency could not bar the Michigan

P&A from obtaining records and information about children in its facilities.  It rejected

defendant's argument that production of such information and records would violate its

obligations under the privacy/confidentiality requirements of the IDEA and FERPA.

Specifically, the court held that:

> [FERPA] does prohibit federal funding to educational institutions
> which permit the release of records without parental consent. The
> DD and PAIMI Acts, however, clearly mandate that organizations
> like [Michigan Protection and Advocacy System] have the authority
> to access [Michigan Department of Social Services] facilities and
> records in specific cases where the developmentally disabled and
> mentally ill individuals are involved.  Defendant's reliance on the
> IDEA is misplaced.  Furthermore, [Michigan Protection and Advocacy
> System] itself has a statutory duty under [PAIMI] to maintain the

6

confidentiality of any records to the same extent as DSS.[2]

849 F. Supp. At 1208 (citing P&As' duty of confidentiality at 42 U.S.C. § 10805(a)).

Whether one statute preempts another is ultimately a question of Congressional intent.

*See Center for Legal Advocacy, 323 F. 23d* at 1272. (In analyzing preemption, "congressional

intent is the ultimate touchstone" (citations omitted)).  In the P&A Acts, Congress set forth a

wide-ranging set of investigatory duties for P&As that include considerable rights to access of

otherwise confidential information.  Without such access, P&As could not fulfill these duties.

This is the precise conclusion reached by the court in *Arizona Law Center for Disability Law v.*

*Allen*, 197 F.R.D. 689, 693 (D. Ariz. 2000).  In discussing the "probable cause" standard, it

stated:

> To conclude otherwise would frustrate the purpose of the P&A laws
> to establish an effective system to protect and advocate for the rights
> of individuals with disabilities.  Without access to records, a P&A
> system is unable to accomplish its congressional mandate to investigate
> incidents of abuse and neglect when the P&A has probable cause to
> believe that such incidents occurred.

2. P&A Access Statutes Override FERPA Under the Rules of Statutory Construction.

a. The Specific Governs the General.

It is "commonplace of statutory construction that the specific governs the general."

*Morales v. Trans World Airlines*, 504 U.S. 374 (1992) *cited in United States v. 103 Electronic*

*Gambling Devices*, 223 F.3d 1091, 1102 (9th Cir. 2000); *Atl. Fish Spotters Ass'n v. Evans*, 321

F.3d 220, 228 (1st Cir. 2003).  FERPA is a general statute covering all educational rules and all

---

[2] The PAIMI and PADD statutes have similar provisions obligating the P&As to maintain
confidentiality.  As is discussed *infra* at 8, this is an important element in analyzing  the
defendant's proffered FERPA concerns in the present case.

students. In contrast, the P&A Acts are specific to persons with disabilities, concern access to otherwise confidential information and mandate the confidentiality of information given to the P&A. Accordingly, the P&A Acts control over the more general applicable provisions of FERPA.

        b. The Later and More Specific Statute Controls the Earlier and More General One.

    FERPA was enacted by Congress in 1974. As noted above, it is a general statute applicable to educational records for all students, whether or not they have disabilities, and covers educational records from elementary school through post-secondary education. The DDA was enacted in 1975 and the other P&A statutes were enacted much later. *See* fn. 1, *supra* at 4. These Acts apply only to individuals with disabilities, including access to their records. Because the P&A Acts are more specific than FERPA and enacted later, they preempt FERPA. Where two statutes conflict, the later and more specific statute usually controls the more general one. *Hellon and Associates Inc. v. Phoenix Resort Corp.*, 958 F.2d 295, 297 (9th Cir. 1992); *Dittman v. California*, 191 F.3d 1020, 1032 (9th Cir. 1999).

    3. Even if this Court Ruled that the DDA Does not Preempt FERPA, the Two Statutes can be Harmonized.

    In *Electronic Gambling Devices*, the 9th Circuit Court of Appeals set forth the principle of harmonizing statutes.

> The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent congressional intention to the contrary, to regard each as effective. 'When there are two acts upon the same subject, the rule is to give effect to both if possible...'"

223 F.3d at 1102 (quoting *Morton v. C.R. Mancari*, 417 U.S. 535, 550-51 (1974)).

The general purpose of FERPA is to protect students and their families from unnecessary and potentially embarrassing disclosures of private information. While recognizing that schools and other educational institutions need to have access to such records in order to effectively meet their professional duties, it places strict obligations on such institutions, barring an exception to the statute, not to re-disclose the information to third parties. Similarly, with respect to the DDA, this statute allows P&As to have access to confidential records in order to perform certain congressionally mandated duties, including investigating allegations of abuse and neglect of persons with developmental disabilities. It also places the same prohibitions against re-disclosure on the P&As that FERPA places on educational institutions. It is evident that the two statutes have overlapping purposes and can be harmonized in that they both contain critically important provisions that confidential information obtained can't be re-disclosed. Thus there is no conflict as the statutes can work in consonance with each other.

4. <u>In Addition to the Right to Obtain Records from KDC, the DDA gives DLC the Right to Obtain the Names and Addresses of the Students' Guardians.</u>

The guardian contact information regulation is unambiguous. It states:

> If a [P&A] is denied access to facilities and its programs, individuals with developmental disabilities, or records covered by the [DD] Act, it shall be provided promptly with a written statement of reasons, including, in the case of a denial for alleged lack of authorization, the name and address of the legal guardian, conservator, or other legal representative of an individual with developmental disabilities.

45 C.F.R. § 1386.22(i).

In order for DLC to obtain the names and addresses of the students' guardians at KDC pursuant to the DDA, DLC is not required to establish that it received a "complaint" to the

system or to establish "probable cause" as is necessary in order to obtain confidential documents. 45 C.F.R 1386.22(a)(3)(i-iii); 45 C.F.R 1386.22(b)(c). *See also* Plaintiff's Memo at 6 - 8. In the case of *Pennsylvania Protection & Advocacy, Inc. (PP&A) v. Royer Greaves School for the Blind*, 1999 WL 179797 (E.D. Pa., March 25, 1999), the court held that the Pennsylvania Protection and Advocacy Inc. was entitled to a list of guardians provided by the school even though it had not established that there was a complaint to the system or probable cause. *Id.* at 8. In the instant case, DLC has specifically requested a guardian list from KDC and KDC, despite the clear authority on this matter, has refused to comply with the request. *See* Exhibits A and C of Defendant's Memo.

## C. EVEN IF THE COURT WERE TO FIND THAT THE DDA DOES NOT PREEMPT FERPA, DLC HAS A RIGHT TO THE GUARDIAN CONTACT LIST UNDER THE DIRECTORY EXCEPTION TO THE FERPA STATUTE.

FERPA allows for the disclosure, without parental consent, of student directory information, including contact information. 20 U.S.C. § 1232g(b)(1). Directory Information is defined in FERPA as including the following: the student's name, address, telephone listing, date and place of birth, major field of study, and participation in officially recognized activities. Disclosure of directory information is subject to the school district giving notice of the proposed disclosure and allowing a reasonable amount of time for parents to respond. See 20 U.S.C. § 1232g(4)(A)(5)(a). Examples of outside organizations which can access directory information include companies that manufacture class rings or publish yearbooks. *See* Exhibit B appended to this Memorandum. As a matter of common sense and sound public policy, it is reasonable to conclude that P&As should be given the same access to student directory information to which

10

these companies are entitled.  Indeed, KDC acknowledges the relevancy of the directory

information exception to FERPA, arguing only that the proper notice has not been provided to

the parents.  Opposition Memo at 16.  As one of the remedies sought in the case at bar, plaintiff

would seek an order from this Court directing the defendant to give all KDC parents the required

notice, thereby setting in motion the process for DLC to obtain the directory information.

## CONCLUSION

For the reasons stated in plaintiff's initial Memorandum of Law in Support of Plaintiff's

Motion for Preliminary Injunction, as well at this Memo, DLC respectfully asks for the relief

requested.

DISABILITY LAW CENTER, INC.
Plaintiff,

By attorneys,

Date:  8/6/04

Janine A. Solomon, B.O.# 567964
Disability Law Center, Inc.
11 Beacon Street, Suite 925
Boston, MA 02108
(617) 723-8455

Matthew Engel, BB0 #547465
Disability Law Center, Inc.
30 Industrial Drive, East
Northampton, MA 01060
(413) 584-6337

11

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be served upon Regina Williams Tate, Esq., Murphy, Hesse, Toomey & Lehane, LLP, 300 Crown Colony Drive, Suite 410, Quincy, MA 02269-9126, counsel for defendant, by first class mail on August 5, 2004.

Janine A. Solomon